## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RON PETERSON FIREARMS, LLC, DALE
RUTHERFORD, d/b/a as THE COP
SHOP, AND TRACY RIFLE & PISTOL, INC.


      Plaintiffs,


vs.                                                           No. 11-CV-678 JEC/LFG
                                                           (Consolidated with 12-CV-167)

B. TODD JONES, ACTING DIRECTOR,
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

      Defendant.


### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      THIS MATTER comes before the Court on *Defendant's Motion for Summary Judgment*
(Doc. 51) ("ATF's Motion"), *Plaintiff's Motion for Summary Judgment* (Doc. 50) ("Peterson's
Motion"), and *Plaintiff's Memorandum in Support of Cross Motion for Summary Judgment*
(Doc. 52) ("Rutherford's Memorandum").  Having reviewed the pleadings and the governing
authority, and being otherwise fully informed, the Court finds that ATF's Motion is well-taken
and will be granted, and that Peterson's Motion is not well-taken and will be denied.

      **I.**      **Factual Background**

      Plaintiffs Dale Rutherford, doing business as The Cop Shop, Tracy Rifle and Pistol, Inc.,
and Ron Peterson Firearms, LLC. (collectively, the "Plaintiffs") seek declaratory and injunctive
relief against the Acting Director of the Bureau of Alcohol, Tobacco, Firearms & Explosives

(hereinafter "Defendant" or "ATF") under section 706(2) of the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* ("APA").  Plaintiffs are Federal Firearms Licensees ("FFLs"), subject to ATF's recent requirement in the form of a demand letter that gun dealers in the Southwest border states of Texas, Arizona, New Mexico, and California report information pertaining to multiple sales of certain semi-automatic rifles.  Specifically, ATF sent a letter in July of 2011 to FFLs in these four states stating that:

> You must submit to the [ATF] reports of multiple sales or other dispositions whenever, at one time or another during any five consecutive business days, you sell or otherwise dispose of two or more semiautomatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.6 caliber) to an unlicensed person.  You are required to report all such sales that occur on or after August 14, 2011.  You must continue reporting multiple sales for the rifles subject to this demand letter until we provide written notice to stop.

*See* Administrative Record ("AR") at 775-76 ("Demand Letter") (stating that it has the authority [to request such information] under 18 U.S.C. § 923(g)(5)).

ATF issued the Demand Letter upon determining, along with other governmental agencies, that its efforts to "investigate and combat the illegal movement of firearms along and across the Southwest border" was being hindered by its lack of data on the increasingly more powerful and lethal firearms used in weapons trafficking along the border.  *Id.*; *see also* AR at 38, 52, 60, 63 (GAO Report) (noting that "multiple purchases of firearms by a non-licensee provide a significant indicator of firearms trafficking," and that "limitations on reporting requirements for multiple sales" were a "significant challenge" in combating the trafficking of arms across the Southwest Border."); AR at 288-299 (DOJ Office of Inspector General, Review of ATF's Project Gunrunner (Nov. 2010) ("OIG Review") ("[b]ecause reporting multiple sales

of handguns generates timely, actionable investigative leads  ...  , and because long guns have become Mexican cartels' weapon of choice, we believe that the reporting of multiple sales of long guns would assist ATF in identifying trafficking suspects.").  The DOJ Inspector General further reported that "[o]ur analysis shows that many long guns seized in Mexico have a short time-to-crime and were often part of a multiple purchase.  We therefore believe that mandatory reporting of long gun multiple sales could help ATF identify, investigate, and refer for prosecution individuals who illegally traffic long guns into Mexico." *Id*. (recommending that ATF "explore options for seeking a requirement  for reporting multiple sales of long guns.").

ATF's trace data revealed the border states of Arizona, California, New Mexico and Texas to be significant sources of these firearms.[1]  AR at 50-55.  "From fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states.  In particular about 70 percent of these firearms came from Texas, California and Arizona."  *Id*. at 54.  ATF thus required certain FFLs in these states report multiple sales of certain rifles in order to address a gap in its intelligence gathering.  See A.R. at 220; 287. Specifically, ATF collects this information to enable it to "more quickly trace those firearms if they turn up in a crime because the information is already entered into a searchable database." A.R. at 60.

---

[1]"While the eTrace data only represents data from gun trace requests submitted from seizures in Mexico and not all guns seized, it is currently the only systematic data available, and the conclusions from its use that the majority of firearms seized and traced originated in the United States were consistent with the conclusions reached by U.S. and Mexican government and law enforcement officials involved personally in combating arms trafficking to Mexico."  *Id*. at 51.

Plaintiffs contend that ATF's demand for this information exceeds the scope of its statutory authority.  Rutherford alternatively contends that even if statutory authority for ATF's action exists, ATF's decision to impose the reporting requirement was arbitrary and capricious.

## II.       Statutory and Regulatory Background

### A.       The Gun Control Act of 1968

Congress enacted the Gun Control Act ("GCA") of 1968, 18 U.S.C. § 1921 *et seq*, to "provide support to Federal, State and local law enforcement officials in their fight against crime and violence" by "strengthen[ing] Federal controls over interstate and foreign commerce in firearms."  Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213; H.R. Rep. No. 90-1577 (1968). The GCA also requires a person to obtain a federal license before engaging in the manufacture, importation and sale of firearms.  18 U.S.C. §§ 1922(a)(1), 923(a).  Licensees, otherwise known as FFLs, must create and maintain records of all firearms transactions, including the name, age, and place of residence of individual firearms purchasers, and submit certain reports and information.  18 U.S.C. §§ 1922(b)(5), 923(g).  The GCA also provides for the inspection of these records and authorizes the promulgation of such rules and regulations as necessary to carry out the provisions of the Act.  18 U.S.C. §§ 923(g)(1), 926.

ATF, the agency authorized to enforce the federal firearms law, licenses and inspects FFLs to ensure that they comply with the laws governing the sale, transfer, possession and transport of firearms and that they maintain records in accord with federal requirements.  28 U.S.C. § 599A; 28 C.F.R. § 0.131; 28 U.S.C. § 923(g)(1).  "ATF also operates the National Tracing Center to processes requests from Federal, State, local, and foreign law enforcement

agencies for the tracing of guns associated with crimes ('crime guns') and to collect and analyze trace data." *National Shooting Sports Foundation  v. Jones,* 840 F.Supp.2d 310, 313 (citing 28 C.F.R. § 0.131).

### B.      The Firearms Owners' Protection Act of 1986

Congress enacted the Firearms Owners' Protection Act of 1986 ("FOPA") "to reduce the regulatory burden on law-abiding firearms owners without incapacitating [ATF's] ability to combat violations of the firearms laws." *RSM, Inc. v. Buckles*, 254 F.3d 61, 64 (4th Cir. 2001). In striking this balance, FOPA prohibited the federal government from creating a registry of firearms but preserved its authority to examine records of firearms transactions in the course of a criminal investigation. *Nat'l Shooting Sports Found*., 840 F.Supp.2d at 314 (citing 18 U.S.C. § 926(a)).  Section 18 U.S.C. § 926(a) provides:

> [T]he Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter.... No such rule or regulation prescribed after the date of the enactment of [FOPA] may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation.

FOPA also amended the GCA by adding various provisions to 18 U.S.C. § 923(g), including section 923(g)(5)(A), which "authoriz[es] ATF to issue demand letters requiring FFLs to report gun sales information as specified by the demand letter." *Id.* (citing 18 § U.S.C. and 27

C.F.R. § 478.126).  Section 923(g)(5)(A) "'essentially codified 27 C.F.R. § 178.126(a), [a] 1968

regulations requiring [licensees] to submit record information when the Bureau seeks it.'" *J & G*

*Sales Ltd. v. Truscott*, 473 F.3d 1043, 1048 n.3 (9th Cir. 2007) (quoting *RSM* at 64).  Section

923(g)(5)(A) states that "[e]ach licensee shall, when required by letter issued by the Attorney

General, and until notified to the contrary ...  submit on a form specified by the Attorney

General, for periods and at the times specified in such letter, all record information to be kept by

this chapter or such lesser record information as the Attorney General in the letter may specify."

18 U.S.C. § 923(g)(5)(A).

      FOPA added section 18 U.S.C. § 923(g)(3)(A), which mandates that FFLS "report the

sale or disposition of two or more pistols or revolvers to the same person at one time or during

five consecutive business days." *Nat'l Shooting Sports Found.*, 840 F.Supp.2d at 313.  FOPA

also added section 923(g)(1)(B), which authorizes inspection of a licensee's inventory and

record" without "reasonable cause or warrant ... during the course of a criminal investigation of a

person or persons other than the licensee," when ensur[ing] "compliance with record keeping

requirements," or when "required for determining the disposition of one or more particular

firearms in the course of a bona fide criminal investigation."  18 U.S.C. § 923(g)(1)(B).

      **C.**        **18 U.S.C. § 923(g)(7)**

      Nine years after enacting FOPA, Congress passed 18 U.S.C. § 923(g)(7), which mandates

that FFLS respond immediately to a request for records in the course of a criminal investigation:

> Each licensee shall respond immediately to, and in no event later than 24 hours
> after receipt of, a request by the Attorney General for information contained in
> the records required to be kept by this chapter as may be required for determining
> the disposition of 1 or more firearms in the course of a bona fide criminal

investigation. The requested information shall be provided orally or in writing, as the Attorney general may require.

18 U.S.C. § 923(g)(7).  Section 923(g)(7) "serves quite [a] distinct purpose from the demand letter," in that it "imposes speedy reporting requirements on [licensees] in the context of criminal investigations, and neither explicitly nor implicitly serves to limit the Bureau's power under § 923(g)(5)(A)."  *J & G*, 473 F.3d at 1050.

### D.    Appropriations Legislation

Since fiscal year 1978, Congress has included a restriction in the annual appropriations legislation "forbid[ding] the Bureau from establishing a national firearms registry." *J & G*, 473 F.3d at 1045.  The restriction prohibits the expenditure of funds "in connection with consolidating or centralizing, within the Department of Justice, the records, or any portion thereof, of acquisition and disposition of firearms maintained by the [FFLs]."  Consolidated and Further Continuing Appropriations Act of 2012, Pub.L. No. 112-55, 125 Stat. 552, 609 (2011).

### III.    Legal Standards

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).  A "genuine" dispute exists where the evidence is such that a reasonable jury could resolve the issue either way.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248).  The court must

consider all the evidence in the light most favorable to the party opposing summary judgment. *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

###    B.    Judicial Review of an Agency Decision

The Administrative Procedure Act ("APA") provides a right to judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  In reviewing an agency's action under the APA, this Court acts as appellate tribunal.  *See Olenhouse v. Commodity Credit Corp*., 42 F.3d 1560, 1580 (10th Cir. 1994).  Under the APA, a reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*.; § 706(2)(A) & (C).  In other words, a court's inquiry is whether the agency:  (1) acted within the scope of their authority; (2) complied with prescribed procedures; and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion.  *Wyoming Farm Bureau Federation v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000) (citing *Olenhouse,* 42 F.3d at 1574.).

When reviewing an agency decision under the APA, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the agency given the responsibility and authority to administer and give effect to a statute.  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 104 S.Ct. 2778, 2782 (1984).  In determining whether an agency permissibly construed its enabling statute or exceeded its statutory authority, a court's inquiry is "shaped by the specificity of the Congressional enactment."  *Id*.  The court must first determine whether "Congress has directly spoken to the precise question at issue."  *Id*.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id*.; *Desert*

8

*Palace, Inc. v. Costa*, 123 S.Ct. 2148, 2153 ("[W]here the words of the statute are unambiguous, the judicial inquiry is complete."). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* While the court must not impose its own construction of the statute under inquiry, the court will not defer to an agency's construction if it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.*

"The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.'" *Olenhouse,* 42 F.3d at 1574 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 103 S.Ct. 2856, 2866 (1983)). "Because the arbitrary or capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Olenhouse*, 42 F.3d at 1575 (citing *Motor Vehicle Mfrs. Ass'n.*, 103 S.Ct. at 2866 (1983)). While a reviewing court cannot substitute its judgment for that of the agency or accept *post-hoc* rationalizations for agency action, it will uphold "a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 1580; *National Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518, 2530 (2007) (internal citation omitted).

Agency action is considered arbitrary or capricious if the agency: (1) relied on factors which Congress had not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for the decision that runs counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a difference

9

in view or the product of agency expertise. *Id.* Under this deferential standard, a court need only determine "whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 91 S.Ct. 814, 823 (1972); *abrogated on other grounds by California v. Sanders*, 97 S.Ct. 980 (1977). Agency action is afforded a presumption of validity and the burden is on the petitioner to demonstrate that the action is arbitrary and capricious. *Sorenson Commc'ns, Inc. v. F.C.C.*, 567 F.3d 1215, 1221 (10th Cir. 2009).

### III.  <u>Analysis</u>

### A.  **ATF Acted Within its Statutory Authority**

#### 1.  <u>ATF Acted Within the Scope of its Authority Under §</u> <u>923(g)(5)(A)</u>

ATF states that the issuance of its Demand Letter complied with 18 U.S.C. § 923(g)(5)(A), which provides that:

> Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at times specified in such letter, all record information required to be kept by this chapter or such *lesser record information* as the Attorney General in such letter may specify.

Def's Mot. at 31 (quoting 18 U.S.C. § 923(g)(5)(A)). Plaintiffs challenge this interpretation, alleging that ATF lacked statutory authority for issuing its Demand Letter. Because the Court

finds § 923(g)(5)(A) to be clear and unambiguous, it will give effect to the "unambiguously

expressed intent of Congress."[2]  *Chevron*, 104 S.Ct. at 2762 at 842; *Nat'l Shooting Sports*

*Found.*, 840 F.Supp.2d at 317-318 ("[t]he Court finds that the statute at issue, 18 U.S.C. §

923(g)(5)(a), is unambiguous; thus the Court completes its inquiry at *Chevron* step one.").

Accordingly, the Court looks to the plain language of 18 U.S.C. § 923(g)(5)(A) to determine the

scope of ATF's statutory authority and whether or not it exceeded that scope.  *Id*.

        In *Nat'l Shooting Sports Found.*, the District Court for the District of Columbia analyzed

an identical demand letter and rejected the plaintiffs' assertion that ATF lacked the authority to

issue it.  840 F.Supp.2d at 31p.  Noting that the demand letter was "limited to Type 1 and 2

FFLs[3]  in the four states that border Mexico," constituting only 16% of Type 1 and 2 FFLs

nationwide, and sought information that FFLs were already required to maintain, the court

determined that the demand letter did not exceed ATF's authority under § 923(g)(5)(A) or result

in the creation of a national gun registry.  *Id*. at 319-320.  The Court finds this reasoning to be

persuasive.  In enacting § 923(g)(5)(A), Congress clearly gave ATF "broad authority to seek, by

demand letter, all record information that [FFLs] are required to maintain." *Blaustein & Reich,*

365 F.3d at 286 (4th Cir. 2004).   The GCA already requires licensees to maintain records of

"receipt, sale, or other disposition of firearms ... as [ATF] may by regulations prescribe,"

---

[2] The Court declines to address Plaintiffs' arguments regarding the legislative history of 18 U.S.C. § 923 because it has considered § 923(g)(5)(A) in its broader statutory context and does not find the statute to be ambiguous.  *See J & G*, 473 F.3d at 1048-1049 ("[b]ecause we find that – even after considering § 923(g)(5)(A) in its broader context  – the statute is clear, we need not address J & G's exhaustive discussion of 18 U.S.C. § 923's legislative history.").
[3]"Licensees are categorized into eleven types, including Type 01 (dealers in firearms other than destructive devices) and Type 02 (pawnbrokers of firearms other than destructive devices), and ATF regulations specify the records each Type is required to keep."  *Id*. (citing 27 C.F.R. §§ 478.124(c)(1) & (e); 478.125(e)).

including a Firearms Transaction Record, ATF Form 4473, which requires information about the purchaser and the gun any time a licensee transfers a firearm to a non-licensee.[4]  18 U.S.C. §923(g)(1)(A); 27 C.F.R. § 478.124.  The Demand Letter requires a limited subset of this information: (1) sales to the same unlicensed person; (2) within five consecutive business days; (3) of two or more semiautomatic rifles with calibers greater than .22 and the ability to accept a detachable magazine.  *See* ATF's Reply at 2-3.  Because the Demand Letter seeks information that FFLs are already required to maintain, ATF has acted within its statutory authority under § 923(g)(5)(A).  *See Nat'l Shooting Sports Found*., 840 F.Supp.2d at 318 ("Congress has unambiguously given ATF the authority to mandate reporting in the manner it has here.").

Peterson contends that by requiring identification of a firearm's type of action (semi-automatic, lever pump, bolt, single shot), type of feeding source (fixed magazine, detachable magazine, clip, tube), and the number of days that pass between the sale of rifles, ATF improperly seeks information that FFLs are not already required to maintain by regulation. Peterson's Mot. 4-6.  Peterson adds that ATF is not simply requesting a subset of information but requiring the creation of new records.  Peterson's Reply at 2-4.  The plaintiffs in *Nat'l Shooting Sports Foundation* similarly argued that the demand letter improperly required them to assess and report when a multiple sale of *certain* long guns had been made to the same person within the same day or within five business days.  840 F.Supp.2d at 321 (emphasis added).  The court disagreed, stating that "[c]ontrary to the thrust of the argument, reporting of partial records

---

[4]Specifically, Form 4473 requires that FFLS record the buyer's name, sex, address, date and place of birth, country of citizenship, and a certification that he or she is the actual buyer and is not prohibited from receiving or possessing the firearm, and the firearm's manufacturer, type, model, gauge or caliber, and serial number.  27 C.F.R. § 478.124.

is specifically authorized by § 923(g)(5)(A)," which does not limit ATF's demand letter authority to requests for records "in the same manner as they are currently kept." *Id*. at 321-322. In *10 Ring Precision, Inc. v. Melson*, 11-CV-663,*7 (W.D. Tex. 2012), the District Court for the Western District of Texas rejected the same argument based on identical demand letter, stating that "[h]aving already been placed on alert by the demand letter itself, a licensed firearms dealer is most unlikely to confuse a modern semi-automatic rifle capable of accepting a detachable magazine with a Winchester 73; in other words, compliance with the demand letter calls for no more than a distillation of records required to be kept by statute and regulation." Indeed, the fact that ATF has provided limiting criteria to specify the subset of information it is seeking does not mean that ATF improperly seeking new information or exceeding its statutory authority.

Rutherford asserts that ATF's tracing authority for issuing the Demand Letter is limited to "bona fide criminal investigations" under § 923(g)(7), and that ATF has exceeded its statutory authority by seeking this information in the absence of a criminal investigation. Rutherford's Memo. at 25. Peterson also states that ATF has exceeded the scope of its authority by issuing a broad request for information in contravention of the prohibition against the creation of a national firearms registry. ATF responds that Section 923(g)(7) does not constrain the agency's tracing authority and that the narrowly tailored " multiple sales reports of rifles directly facilitates ATF's tracing power" because "[i]f and when law enforcement officials seek a firearms trace from ATF for one or more of the rifles, the agency can reference its multiple sales reports in order to complete the traces more quickly and effectively." ATF's Response at 13-15.

Section 923(g)(7) serves a distinct purpose by requiring speedy reporting during a criminal investigation and does not reference or limit demand letter authority under

§ 923(g)(5)(A).  *See Nat'l Shooting Sports Found*., 840 F.Supp.2d at 320 (joining other courts in declining to strip 923(g)(5)(A) of its independent meaning); *RSM*, 254 F.3d at 66 (Section 923(g)(7) "does not purport either to address or restrict [ATF's] section 923(g)(5)(A)'s authority to issue letters.").  Further, while the Fourth Circuit in *RSM* observed that there were limits to ATF's demand letter authority, "it did not delineate the precise scope of that authority because the demand letter at issue was sufficiently tailored to ATF's tracing needs." *Nat'l Shooting Sports Found*., 840 F.Supp.2d at 318.  "While we are not free to ascribe to section 923(g)(5)(A) an open-ended reach, neither are we at liberty to eliminate all together its positive grant of authority."  *RSM*, 254 F.3d at 67 (concluding that "[i]n light of the narrow scope of the demand letter [issued to only .01 percent of FFLs nationwide who had failed to comply with prior tracing requests] and its direct relationship to [ATF's] explicit statutory duties ...  there was no statutory violation."); *see also Blaustein*, 365 F.3d at 285-288 (demand letter requiring 450 FFLs to report purchases of secondhand firearms did not exceed statutory authority or contravene § 926(a)'s prohibition on creating a national firearms registry); J & G, 473 F.3d at 1049 (demand letter issued to small fraction of FFLs seeking limited subset of information regarding a limited subset of firearms fell safely within scope of ATF's authority).

Because § 923(g)(7) does not limit ATF's demand letter authority under § 923(g)(5)(A), the Court does not find that ATF improperly relied on its statutory duty to investigate violations of federal firearms laws when issuing the Demand Letter.  Further, although the Demand Letter is "arguably broader than the letters at issue in *RSM*, *Blaustein*, and *J & G*, it is still limited in scope" because it only requires a small percentage of Type 01 and Type 02 FFLS (approximately 15.8%) to submit a limited subset of information on a limited subset of firearms.  *See Nat'l Shooting Sports Found*., 840 F.Supp.2d at 319-320.   For this reason, and because there is no evidence that ATF is using the letter as a "ruse to create a national gun registry," the Court finds that ATF did not exceed the scope of its statutory authority when issuing the Demand Letter. *Id*.; *RSM*, 254 F.3d at 68.

14

2.      Section 923(g)(1)(A) Does Not Limit ATF's Demand Letter
        Authority Under Section 923(g)(5)(A)

The Plaintiffs contend that ATF's Demand Letter is inconsistent with § 923(g)(1)(A),

which provides that licensees "shall not be required to submit to [ATF] reports and information

with respect to such records and contents thereof, except as expressly required by this section."

Peterson Mot. at 12-20; Rutherford's Memo. at 121-31.  Specifically, they assert that

§ 923(g)(1)(A) restricts ATF's demand letter authority to the "subject matters on which reporting

Congress expressly required under sections 923(g)(3), (g)(4), (g)(6) and (g)(7)."  Rutherford's

Memo. at 29; Peterson's Mot. at 12-20.  The Plaintiffs further assert that the Demand Letter

"cannot be reconciled with § 923(g)(3)(A), wherein Congress chose to limit reporting of multiple

sales to only pistols and revolvers" and that its silence about firearms other than pistols and

revolvers is controlling. Peterson's Motion at 18-19; Rutherford's Memo. at 20.  ATF contends

that §§ 923(g)(3), (g)(4), (g)(6) and (g)(7) are not "subject matters," rather, they are subsections

of § 923 requiring FFLS "to permit inspection or report record information under *specific*

*circumstances*." *Nat'l Shooting Sports Found.*, 840 F.Supp.2d at 320 (emphasis added).

Courts have consistently rejected the argument that demand letters authorized under §

923(g)(5)(A) are inconsistent with § 923(g)(1)(A) unless they are limited to the information

permitted under the other subsections of § 926.  *See J & G*, 473 F.3d at 1049 ([i]t is certainly true

that § 923(g)(1)(A) limits the Bureau's ability to procure information from [licensees] to the

express requirements of § 923, but it does not eviscerate the content of § 923(g)(5)(A)); *Blaustein*

*& Reich,* 365 F.3d at 287 n.14 (4th Cir. 2004) (emphasis in original) (because § 923(g)(5)(A)

expressly requires an FFL to produce record information when the Bureau issues a demand letter

seeking it, it is itself "an *express requirement* that is provided for in § 923(g)(1)(A)); *Nat'l Shooting Sports Found*., 840 F.Supp.2d at 320 (citing *Blaustein*, 365 F.3d at 286) (emphasis added); ("this section" refers to § 923(g), which encompasses § 923(g)(5)(A).

In *J & G,* the Ninth Circuit rejected the plaintiff's argument that § 923(g)(3)(A), which requires reports of multiple handgun sales, limited ATF's demand letter authority.  473 F.3d 1043, 1050 (9th Cir. 2007).  The court held that "[s]imply because some provisions of § 923 impose specific duties upon FFLs to respond within a specified time frame and to provide record information *sua sponte* does not mean that the Bureau is prohibited from seeking further FFL record information by demand letter."  *Id*. (adding that "[n]othing in the statute suggests that the Bureau's authority extends only to the statutory authority [the plaintiffs] agree to recognize."); *see also Nat'l Shooting Sports Found*., 840 F.Supp.2d at 320-321 ("the requirement that FFLs report multiple sales of handguns under § 923(g)(3) does not limit ATF's authority to seek a different subset of record information, such as multiple sales of certain rifles, via demand letter.").  As stated, *supra*, at 13-14, courts have also rejected the assertion that § 923(g)(7) prevents ATF from demanding records outside the course of a criminal investigation.  *J & G* , 473 F.3d at 1050; *RSM*, 254 F.3d at 66 (Section 923(g)(7) "does not purport either to address or restrict [ATF's] section 923(g)(5)(A)'s authority to issue letters;" rather "it establishes the duties of the FFLs when they receive a trace request.").

The Fourth and Ninth Circuits have likewise held that § 923(g)(1)(B), which specifies the circumstances under which ATF may physically examine records without a warrant, does not limit ATF's demand letter authority.  *J & G*, 473 F.3d at 1050 (§ 923(g)(1)(B) is "aimed at preventing warrantless on site searches," as opposed to a demand letter requesting limited

16

information without physical intrusion, noting that is "is a difference that matters."); *RSM*, 254 F.3d at 66 ("[t]he statutory scheme makes it clear that section 923(g)(1)(B) is aimed at preventing warrantless on-site searches," in contrast to a demand letter issues under section 923(g)(5)(A), which does not involve the entry of ATF's agents onto an FFL's premises.).[5]

Accordingly, the fact that § 923(g)(1)(A) limits ATF's ability to obtain information from licensees to the express requirements of § 923 does not negate the fact that § 923(g)(5)(A) *expressly* provides ATF with "broad authority to seek, by demand letter, *all* record information that FFLs are required to maintain." *Blaustein*, 365 F.3d at 286 (emphasis added). As courts have unanimously determined, the other provisions of § 923 do not limit this authority. To conclude otherwise would eviscerate ATF's authority under § 923(g)(5)(A) to obtain record information.

3.   <u>ATF's Demand Letter Does Not Violate Section 926(a) of</u><br><u>the GCA</u>

Peterson alleges that ATF's Demand Letter violates § 926(a) because it results in the creation of a national firearms registry. Peterson's Mot. at 28-29. Peterson also contends that unlike the demand letter at issue in *RSM*, ATF is also requesting information about the purchaser, including name, residence address, sex, race, identification number, type, State, and date and place of birth, resulting in the type of database "about which Congress expressed grave concern." Peterson's Mot. at 28. ATF responds that it will only retain the information it collects for a

---

[5]Peterson asserts that the Ninth Circuit's analysis "missed the point of the significance § 923(g)(1)(A), § 923(g)(1)(B)(i) and (iii), which were enacted "not simply to protect licensees" from Fourth Amendment violations but to limit ATF's access to records. Peterson Mot. at 14-15. However, as ATF notes, "the plain text of § 923(g)(1)(B) does not purport to be the exclusive means by which ATF may obtain FFL records." Def.'s Mot. at 31.

17

limited period of time and that it will purge purchaser information after two years unless the

information is associated with a trace.  ATF Resp. at 23 (citing AR at 743-744).  ATF further

states that since 1975, ATF has required the same information of FFLs with respect to multiple

sales of handguns, including the name of the purchaser, and that "Congress clearly did not deem

such a requirement to result in a forbidden firearm registry, as demonstrated by the fact that it

codified this requirement at 18 U.S.C. § 923(g)(3)(A) in 1986."  *Id*. at 24 (citing Ex. A (Form

331.04, Report of Multiple Sale or Other Disposition of Pistols and Rifles)).

Section 926(a), enacted in 1986, "prohibits [ATF] or any other federal agency from

promulgating any new rules or regulations that would create a national firearms registry."

*Blaustein*, 365 F.3d at 288.  However, ATF's demand letter authority derives from statutory, not

regulatory, authority.  *See J & G*, 473 F.3d at 1051 ("[s]ection 926(a) has no bearing on §

923(g)(5)(A) because the former provision pertains only to 'rule[s]' and 'regulation[s]' and the

latter is a statute."); *Nat'l Shooting Sports Found*., 840 F.Supp.2d at 319 (§ 926(a) "does not

impact Congress' power to enact statutes such as § 923(g)(5)(A), authorizing demand letter

authority.") (internal citation omitted).  Further, § 926(a) "does not limit the rules and regulations

already in effect, such as ATF's demand letter authority, which has been in effect since 1968."

*Nat'l Shooting Sports Found*., 840 F.Supp.2d at 319 (citing *Blaustein*, 365 F.3d at 288).

Despite the fact that § 926(a) has no bearing on ATF's statutory authority under §

923(g)(5)(A) or rules of regulations in effect prior to 1986, Peterson nonetheless repeats the

concern "that § 926(a) would be rendered meaningless if [ATF] could issue limitless demand

letters under § 923(g)(5)(A) in a backdoor effort to avoid sections 926(a)'s protections."  Peterson

Mot. at 27-30.  Even if § 926(a) were to limit ATF's demand letter authority, the Court has

18

nonetheless determined, *supra* at 14, that the narrowly tailored Demand Letter is not a ruse to contravene § 926(a)'s prohibition against creation of a national registry.

    4.  <u>The Demand Letter Does Not Violate the Appropriations Act</u>

  Peterson alleges that the Demand Letter violates the Appropriations Act by effectively consolidating and centralizing gun sales records despite a restriction prohibiting the use of funds for this purpose. *See* Peterson's Mot. at 30; Consolidated and Further Continuing Appropriations Act of 2012, <u>Pub.L. No. 112-55, 125 Stat. 552</u>, 609 (2011) (funds may not be used "in connection with consolidating or centralizing, within the Department of Justice, the records, or any portion thereof, of acquisition and disposition of firearms maintained by [FFLs].")

  Courts have rejected the assertion that the appropriations rider be "read broadly to serve as an absolute prohibition against the collection of firearms records." *RSM*, 254 F.3d at 67 (had Congress intended the rider to serve as a complete ban, it would not have subsequently passed FOPA, with its statutory reporting requirements and resultant collection of records). "When it passed FOPA, Congress clearly envisioned some sort of collection of firearms records [including those collected pursuant to § 923(g)(3)(A)] so long as it was incidental to some other statutory function specifically delegated to ATF." *Id*. at 68. "In fact, it is significant to note that the handgun reporting requirement (§ 923(g)(3)(A)), [ATF's] demand letter authority  (§ 923(g)(5)(A)), and the prohibition against the establishment of a national system of registration of firearms, firearms' owners, or firearms' transactions (§ 923(a)) were all enacted by Congress in the same public law, [FOPA]." *10 Ring Precision* at * 9. "Contending that one [provision] is in direct conflict with another is simply not credible." *Id*.; *see also Nat'l Shooting*

*Sports Found.*, 840 F.Supp.2d at 321 (rejecting the plaintiffs' assertion that the rider broadly

prohibited the collection of gun sale records.").

Accordingly, in the passage of FOPA, Congress clearly did not envision that the annual

appropriations rider would prohibit a small collection of records. See *RSM*, 254 F.3d at 67; *10*

*Ring Precision* at * 9. Indeed, the Demand Letter is substantially more limited in scope than §

923(g)(3)(A), which requires *all* FFLs to report multiple sales of *all* pistols or revolvers to the

same unlicensed person within a certain time frame. In contrast, the Demand Letter merely

requires FFLs in four states to report multiple sales of specified types of rifles to the same

unlicensed person within a certain time frame. This narrow collection of information does not

violate the appropriations rider.

      **B.**      **ATF's Issuance of the Demand Letter Was Not Arbitrary or**

              **Capricious**

Rutherford asserts that ATF's issuance of the Demand Letter was arbitrary and capricious

because ATF "ignored actual geographic proximity to the border with Mexico and disregarded

evidence of actual licensee-specific trace counts." Rutherford's Memo. at 31-32 (noting that

Tracy Rifle is located more than 400 miles from the border and that there are "many licensed

dealers who sold rifles that were recovered in Mexico but are not required to report multiple rifle

sales to ATF.") (citing AR 448-498). Rutherford further asserts that ATF's decision to issue the

Demand Letter to FFLs in the Southwestern border states was unreasonable in light of "the option

to direct [it] to just those specifically-identified retailers who, by virtue of their proximity to the

border with Mexico, the size of their inventory or other reasons, were shown to have sold

firearms that were recovered in Mexico. *Id*. at 35. Rutherford adds that "[i]t is not enough that

the administrative record reveal some basis for ATF's decision ...  [t]he record most show that ATF considered reasonable alternatives [presented in the AR] to simply targeting every licensee located in California and New Mexico, and why those alternatives were rejected."  *Id*. at 33 (citing *International Ladies Garment Workers Union*, 722 F.2d 795, 818 (C.A.D.C. 1883) in stating that "consideration of alternatives and explaining their rejection are quintessential aspects of reasoned decisionmaking.").

In administering the GCA, ATF enjoys the "'deference generally due an agency charged by Congress with implementing its directives.'" ATF's Mot. at 51 (quoting *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990).  Further, [w]hen it comes to particular line-drawing decisions made in the course of setting policy, an agency "is not required to identify the optimal threshold with pinpoint precision.  It is only required to identify the standard and explain its relationship to the underlying regulatory concerns." *Worldcom, Inc. v. FCC*, 238 F.3d 449, 461-62 (D.C. Cir. 2001).  The courts in *Nat'l Shooting Sports Found*. and *10 Ring Precision* rejected the plaintiffs' assertions that ATF's issuance of an identical demand letter was arbitrary or capricious.  Rather, the courts determined that "ATF acted rationally in targeting FFLs in states bordering Mexico and seeking reporting of multiple sales of semi-automatic rifles."  *Nat'l Shooting Sports Found*., 840 F.Supp.2d at 322-323; *10 Ring Precision* at * 10.  Because the "Demand Letter bears a direct relationship to ATF's statutory duties to trace firearms recovered during criminal investigations and to investigate violations of firearms laws, Plaintiff's have not shown the agency's action violated any law or that it was arbitrary and capricious."  *Nat'l Shooting Sports Found*., 840 F.Supp.2d at 322.  "It was a rational response ... for [ATF] to conclude that gathering transaction information regarding the purchases of a very specific

category of firearms might render more effective the tracing of firearms involved in or relating to the commission of federal offenses." *10 Ring Precision* at * 10.

The Court likewise finds that ATF articulated a rational connection between the facts found and the decision made.  *See Olenhouse,* 42 F.3d at 1574.  ATF's requirement that these Southwest border states, the greatest sources of firearms trafficked to Mexico, report multiple sales of certain rifles in order to address a gap in its intelligence gathering was neither arbitrary nor capricious.  Nor is this decision rendered  unreasonable because ATF did not choose to direct the Demand Letter to retailers already shown to have sold firearms recovered in Mexico.  As noted by ATF, this proposed alternative would require ATF to constantly adjust the specific FFLs subject to the reporting requirement, rendering its enforcement unnecessarily difficult and less effective because  purchasers would avoid those specific dealers.  Further, the cases Rutherford relies upon to establish that ATF improperly failed to address this option are inapposite because they involve the recision of long-standing regulations or policies.[6]

Simply because ATF could have limited its request to a different set of FFLs does not make its decision arbitrary or capricious.  The record reflects that ATF considered the relevant factors and arrived at a rational conclusion.  Regardless of whether that decision is the "best" one in Rutherford's view, it is not arbitrary or capricious.

---

[6] *See* ATF's Resp. at 44 (citing *Int'l Ladies Garment Workers Union v. Donovan*, 722 F.2d 795, 812 (D.C. Cir. 1983) ("This case is a classic example of an agency attempt to modify a longstanding policy by rescinding regulations embodying that policy."); *Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1416 (D.C. Cir. 1983) (FCC's decision to eliminate its requirement that radio licensees maintain programming logs was inadequate in that the Commission failed to give sufficient consideration to the benefits of retaining a modified form of programming logs). "Because the elimination of an ATF program or regulation is not at issue here, Rutherford's reliance on these cases' discussion of the alternatives is misplaced."  *Id.*

## V.    Conclusion

In issuing the Demand Letter, ATF did not violate the law, exceed the scope of its statutory authority under § 923(g)(5)(A), or act arbitrarily or capriciously.  Accordingly, the Court will grant ATF's Motion and deny Peterson's Motion.

WHEREFORE,

**IT IS ORDERED THAT:**

*Defendant's Motion for Summary Judgment*, (Doc. 51) is **GRANTED**; and *Plaintiff's Motion for Summary Judgment* (Doc. 50) is **DENIED**.



_____
For JOHN EDWARDS CONWAY
SENIOR UNITED STATES DISTRICT JUDGE